UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Tia Pass

          v.                           Civil No. 11-cv-284-JL
                                       Opinion No. 2013 DNH 029
Rollinsford School District

**OPINION AND ORDER**

In this action under the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), from which
this court derives its jurisdiction, see id. § 1415(i)(3)(A),
plaintiff Tia Pass challenges the New Hampshire Department of
Education's decision rejecting her claim that the Rollinsford
School District failed to provide her younger sister and ward,
Haley, with a free and appropriate public education ("FAPE").
She asks this court to reverse that decision and to order the
District to reimburse her for the costs associated with Haley's
unilateral placements in two private educational programs.  The
District, in response, argues that (1) parts of the plaintiff's
claim are barred by the statute of limitations and the doctrine
of waiver, (2) it did provide Haley with a FAPE, and (3) even
assuming that it failed to provide a FAPE, reimbursement is not
an appropriate remedy in this case.

After oral argument and an exhaustive review of the record
and the parties' written submissions, the court affirms the
Department of Education's decision.  As an initial matter, the

court concludes that the statute of limitations bars some of the
plaintiff's challenges--specifically, those related to Haley's
ninth-grade (2008/09) individualized education plan ("IEP") and
its later amendment--as she did not bring suit within two years
"of the date on which the alleged violation was or reasonably
should have been discovered." N.H. Rev. Stat. Ann. § 186-C:16-b,
I.  The statute of limitations does not, however, bar plaintiff's
challenges to Haley's later IEPs; nor did plaintiff waive her
right to challenge any of those IEPs by consenting to them in
writing, as she raised her concerns with those IEPs throughout
the school year and, ultimately, revoked the written consent.

As regards the merits of the plaintiff's challenge, the
court concludes that the individualized education programs the
District developed for Haley's sophomore and junior school years
were reasonably calculated to provide her with an educational
benefit and, therefore, provided Haley with a FAPE.  Although the
plaintiff is to be commended for her truly admirable efforts to
ensure that her younger sister receives the very best education
possible, the IDEA does not require the District to provide the
best education, but merely an appropriate one.  See, e.g., Lt.
T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st
Cir. 2004); G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948-49

(1st Cir. 1991).  The District fulfilled this requirement, and is entitled to judgment in its favor.

## I.   __Applicable legal standard__

"The IDEA provides funding to each state 'to assist [it] to provide special education and related services to children with disabilities,' provided that '[a] free and appropriate public education is available to all children with disabilities residing in the state.'" Mr. I ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 4 (1st Cir. 2007) (quoting, with added bracketing, 20 U.S.C. § 1411(a)(1)).  A state discharges this duty "as long as the program that it offers to a disabled student is 'reasonably calculated' to deliver 'educational benefits.'" C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008) (quoting Hendrick Hudson Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).  Generally, this requires the state "to identify children who may qualify as disabled, evaluate each child to determine his or her eligibility for statutory benefits, and develop a customized IEP[1] to ensure that the child

---

[1]An IEP is a written document detailing the student's present educational level, the short-term and long-term goals of the plan, the specific services to be offered, and a set of objective criteria for later evaluation.  See 20 U.S.C. § 1414(d)(1)(A); Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008).  Under the IDEA, the IEP must provide each disabled student with an educational program tailored to his or her individual needs, see 20 U.S.C.

receives a level of educational benefits commensurate with a
FAPE." Id. at 285 (citing 20 U.S.C. §§ 1412(a)(3)-(4),
1414(a)-(b)).

In New Hampshire, if the parent or guardian of a disabled
child believes that the child has been denied a FAPE, he or she
may request a due process hearing before the New Hampshire
Department of Education. See 20 U.S.C. § 1415(f)(1)(A).
Following that hearing, the hearing officer must issue a final
decision, accompanied by findings of fact. See id. §§ 1415(h),
(i)(1)(A). If either party is dissatisfied with the hearing
officer's decision, that party may seek judicial review in state
or federal court. See id. § 1415(i)(2)(A). The reviewing court,
"essentially conduct[ing] a bench trial based on a stipulated
record," Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d
79, 85 (1st Cir. 2012), must then make a bounded, independent
ruling based on the preponderance of the evidence. See Lessard,
518 F.3d at 24; see also 20 U.S.C. § 1415(i)(2)(C)(iii).

The party challenging the hearing officer's decision bears
the burden of proving that the decision is wrong. See Schaffer
v. Weast, 546 U.S. 49, 51 (2005). Purely legal questions arising

---

§ 1400(d)(1)(A), and each student must be offered special
education and related services "as are necessary to permit the
child to benefit from the instruction." Bd. of Educ. v. Rowley,
458 U.S. 176, 189 (1982); see also 20 U.S.C. § 1401(29).

under the IDEA are reviewed de novo.  See Manchester Sch. Dist.
v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002).  But, with respect to
questions of fact, the court's role in reviewing the hearing
officer's decision is "one of involved oversight."  Lenn v.
Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993).  The
applicable standard is an intermediate one, under which the court
must exercise independent judgment, but which, at the same time,
"falls somewhere between the highly deferential clear-error
standard and the non-deferential de novo standard."  Lessard, 518
F.3d at 24.

> The required perscrutation must, at one and the same
> time, be thorough yet deferential, recognizing the
> expertise of the administrative agency, considering the
> agency's findings carefully and endeavoring to respond
> to the hearing officer's resolution of each material
> issue.  Jurists are not trained, practicing educators.
> Thus, the statutory scheme binds trial courts to give
> 'due weight' to the state agency's decision in order to
> prevent judges from 'imposing their view of preferable
> educational methods upon the States.'

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir.
1990) (internal citations and punctuation omitted) (quoting
Rowley, 458 U.S. at 207).[2]

---

[2]The plaintiff argues that the factual findings of the
hearing officer in this case should not be entitled to this level
of deference, deriding his order as "remarkably perfunctory" and
"devoid of analysis."  Pl.'s Decision Memo. (document no. 30) at
4-5.  That characterization has little truth to it.  While the
hearing officer's order spans only two and a half pages, this is
because the order indicates, by number, which of the parties'
proposed findings and rulings are granted and which are denied.

## II.  **Background**

### A.  **Haley's background and early education**

At the time of the Department of Education's hearing in this matter, Haley was an 18-year-old student in the eleventh grade. Her parents are both deceased, and she is under the care and guardianship of her older sister, plaintiff Tia Pass.  Haley lives with Tia,[3] Tia's husband, and their two children in

---

See Admin. R. at 2275-76.  The hearing officer appears to have been thorough and careful in evaluating those proposed findings and rulings:  rather than simply adopting either party's proposal wholesale, he granted or denied each finding and ruling individually (or, in the case of some proposals, chose to neither grant nor deny them because of the way they were phrased or presented).  See id.

Had the hearing officer desired, he simply could have parroted, verbatim, the proposed findings and rulings with which he agreed, and had he done so, he could not by any stretch of even the most fecund imagination be accused of perfunctorily analyzing the facts and law.  But this is a matter of form, not substance.  Although this court's review might have been easier had the hearing officer written out his findings and rulings, nothing more was required.

The plaintiff does correctly note, however, that because this court permitted her to supplement the record with evidence not before the hearing officer, the findings and rulings to which that evidence is relevant should be subject to a somewhat more critical review.  See, e.g., Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221, 375 F.3d 603, 612 (7th Cir. 2004) ("The more that the district court relies on new evidence, . . . the less it should defer to the administrative decision."); Burke v. Amhert Sch. Dist., 2008 DNH 210, 4 (same; quoting Alex R., 375 F.3d at 611-12).

[3]For clarity's sake, the court will refer to the plaintiff by her first name in this section; no undue familiarity or disrespect is intended.

Rollinsford, New Hampshire, within the Rollinsford School District.

Haley was born prematurely and experienced significant medical issues in her early life.  She struggles with a learning disability in mathematics, and performs about five to six years behind other students her age.  She also has deficits in social communication and executive functioning.  A psychological evaluation conducted when Haley was a twelve-year old student in the sixth grade found that her general conceptual ability was only in the third percentile; her adaptive behavior in the fourth percentile; her number skills in the first percentile; her spelling in the 18th percentile; and her word reading in the twelfth percentile.  As a result of these low- to below-average cognitive skills, the evaluation concluded that Haley would require modified assignments and expectations, as well as direct instruction to help her increase her independence and ability to deal with unfamiliar people.

Haley began her education in Maine, where she attended local public schools from kindergarten through the sixth grade.  Throughout this time, Haley required extensive special education consisting of resource room support, speech therapy, occupational therapy, and physical therapy.  She repeated both kindergarten and the fourth grade.  In 2005, Haley and Tia moved to North

Carolina, where Haley attended public school for the seventh grade (which she also repeated).  As a result of Haley's developmental disabilities, the school district in North Carolina classified Haley as eligible for services under the IDEA[4] and, in March 2006, developed an IEP designed to help her address those areas in which she needed assistance.

After moving to Rollinsford in November 2006, Haley enrolled in Somersworth Middle School.  In early December 2006, the IEP team there accepted, with modifications, the IEP that had been developed for Haley in North Carolina, which was to run until March 2007.  Under the IEP, the Rollinsford School District agreed to provide Haley with a "Modified Regular" placement.  In that placement, Haley received mathematics and language arts support at the special education learning center for ten hours per week, speech-language therapy one hour per week, and an assisted study hall three hours per week, but was otherwise "mainstreamed" with non-disabled students.  In March 2007,

---

[4]To receive special education and related services under the IDEA, a child must have a disability, such as "mental retardation, hearing impairments . . . , speech or language impairments, visual impairments . . . , serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities," that necessitates such services.  Mr. I., 480 F.3d at 4-5 (quoting 20 U.S.C. §§ 1401(3)(A)(i)).  In Haley's case, the North Carolina school district determined that she was eligible for IDEA services due to an "other health impairment."

Haley's IEP team revised her IEP slightly to reduce the total
hours of assistance she was receiving, and in November 2007, Tia
agreed to extend the then-current IEP through the beginning of
Haley's ninth grade year in September 2008.

**B.   Ninth grade (2008–2009)**

At an IEP team meeting in April 2008, the District developed
an IEP for Haley's transition to the ninth grade.  The proposed
IEP identified Haley's academic needs as "math applications,
reading comprehension and speech/language," Admin. R. at 631, and
her developmental and functional needs such as dependence on
others, immaturity, emotionality, and difficulty interacting with
peers.  The IEP contained two "goal areas," in reading and math,
and provided for several accommodations, including access to the
learning center to complete assignments; extended time to
complete tests; access to a calculator; reductions in the length
and scope of assignments; and study guides.  The IEP also
provided for an assisted study hall for 90 minutes per day,
during which Haley would receive individualized instruction to
supplement her regular classroom instruction.

Tia executed the IEP on April 8, 2008, indicating her
written consent to its implementation.  Although the form gave
the option of accepting the IEP, rejecting it, or signing it with
exceptions, Tia accepted it outright, i.e., without identifying

9

any exceptions.  At the subsequent due process hearing, Tia
testified that she accepted the IEP only to consent to the
services offered, not because she believed the IEP appropriately
addressed all of Haley's needs.

Haley began attending ninth grade at Somersworth High School
in September 2008.  The District convened a meeting to review
Haley's IEP on October 2, 2008.  At the meeting, the District
dropped the reading goals from Haley's IEP because she was
reading at grade level.  That left only a single goal area in
math.  The revised IEP also provided for only a single service--
an assisted study hall for 90 minutes per day--though it
continued to provide for accommodations and modifications similar
to those in the previous IEP.  Tia executed the revised IEP on
October 2, 2008, again without identifying any exceptions.
Again, though, Tia testified at the due process hearing that her
signature was meant only to indicate her consent to the services
offered, and was not to indicate her belief that the IEP
appropriately addressed Haley's educational needs.

Later in October 2008, Haley participated in cognitive
testing administered by the District's psychologist.  The testing
revealed that Haley's cognitive scores ranged from low average to
extremely low.  Haley also participated in a vocational
evaluation, which revealed that most of her vocational aptitudes

were at the "lowest levels" (though she also scored in the
"average" and even "above average" range for other aptitudes).
Admin. R. at 675-78.  The District convened an IEP team meeting
on November 14, 2008 to review these results, but ultimately made
no changes to the IEP.  It did, however, note that Haley was a
strong verbal learner, and that math teachers would need to make
sure to pair verbal instructions with visual material.

All of Haley's substantive classes during her ninth grade
year were mainstreamed, so that her interactions were primarily
with non-disabled students.  Apart from a Foundations of
Mathematics course during the first semester, Haley received no
instruction in mathematics during ninth grade.  In addition to
the teacher's lecturing in her math class, however, Haley was
provided with small group reinforcement instruction from
paraprofessionals in the class.  During Haley's 90-minute
assisted study hall, special education staff members also worked
directly with Haley to reinforce the concepts taught in her
classes--including her mathematics class--and provided assistance
with her homework and other assignments.  They also assisted
Haley with her social communication skills, "scripting" her day
based on what she anticipated would occur.

Haley also participated in a small, ten-student lunch group
known as "Somersworth Social Skills," or "S-Cubed."  In that

program, Haley was paired with a non-disabled student volunteer
for a 30-minute-per-week lunch period, during which she and the
volunteer--her "social coach"--worked on role playing.  Over the
course of the program, socially appropriate behaviors were
modeled, and Haley and other students received coaching in how to
participate in conversations, how to manage emotions, and similar
topics.  The facilitator of the S-Cubed program testified that
she made efforts to ensure that the behaviors learned in the
lunch group would be generalized across environments, by having
student volunteers attempt to reinforce the behaviors (e.g., by
initiating conversations) during the normal school week.  She
also made recommendations for how teachers could reinforce those
behaviors in the classroom.

Haley's participation in S-Cubed was not guided by any
goals, objectives, measurements, or assessments.  By design, it
was not an IEP service or special education, because the core
concepts taught in the program were not unique to children with
disabilities.  No one assessed or analyzed Haley's social skills
before the S-Cubed program, so there are no objective data
showing whether those skills improved as a result of her
participation.  Both the facilitator of the S-Cubed program and
the school psychologist reported, however, that when Haley
entered S-Cubed, she was shy, nonassertive, and withdrawn from

12

her peer group.  She often misread social cues, was anxious and fearful of speaking up in public and in groups, and was reluctant to contribute to the group.  According to the facilitator, Haley's social skills improved over her time in the S-Cubed program.  She maintained eye contact with conversation partners, was better able to understand and read emotions, volunteered information and opinions, and initiated conversations on her own. Haley received academic credit for her participation in the program.

For her part, Tia testified at the hearing to her observations that Haley struggled academically during the ninth grade, and often became very frustrated when trying to do her homework.  Notwithstanding these struggles, Haley successfully completed the ninth grade, receiving passing grades in her pass/fail courses, and A's and B's in her other courses, including a B in Foundations of Mathematics.  Her IEP report card for the first semester indicated that Haley had "worked diligently in her math class" and "finished the class well," Admin. R. at 281, and her IEP report card for the second semester indicated that she had "proven herself as a good student as she completes assignments on time, completes homework at home, and prepares for tests, projects, or assessments with diligence," id. at 282.  The District promoted her to the tenth grade.

13

C.    **Tenth grade (2009–2010)**

Haley returned to Somersworth High School for tenth grade in the 2009-2010 school year.  She began the year experiencing social difficulties with peers, and when the IEP team met on September 24, 2009, to review her IEP, Haley's social struggles were a chief area of concern.  Following the meeting, the District proposed a new IEP, to begin on October 2, 2009, that identified Haley's primary academic needs as "math applications . . . , speech/language, and learning boundaries in social settings."  Admin. R. at 701.  The proposed IEP set goals for Haley in the areas of "Math," "Transition," and "Social/ Behavioral."  Id. at 706-07.  As before, the IEP provided for only the same 90-minute assisted study hall.  It also provided for essentially the same accommodations Haley had received the previous year:  access to the learning center to complete assignments; extended time to complete tests; access to a calculator; reductions in length of written assignments; and study guides (among other things).  Tia again executed the IEP without exception.  Once again, she testified at the due process hearing that she did so only to consent to the services offered, and not because she believed it addressed all of Haley's needs.

In mid-November 2009, Tia e-mailed Haley's case manager to express concern that the IEP was not sufficient to address

14

Haley's social skills deficits.  In replying to this e-mail, Haley's case manager noted that Haley was again participating in the S-Cubed program[5] (as she had during the ninth grade), and that the District's speech-language pathologist, who had been providing Haley with biweekly consultations during her assisted study hall, felt that "Haley has more of a pragmatic issue in this area."  Admin. R. at 716.  Tia immediately responded that this "reply did not seem to recognize any of my concerns as valid," and requested a speech-language evaluation for Haley and an IEP team meeting.  Id. at 718.

In response, the District held an IEP team meeting on January 21, 2010, at which it formally wrote into the IEP a once-weekly, 30-minute speech-language consultation, a change to which Tia consented.  See id. at 758.  Other than this change, the District did not alter or enhance Haley's IEP, though it offered to extend Haley's graduation date by a year, and to change

---

[5]The S-Cubed program offered in Haley's tenth-grade year repeated a similar curriculum in order to reinforce the social skills learned during the first year, but included different role-playing and behavior reversals.  Haley continued to exhibit growth through her participation in the program.  She would often help other students in the program, and, according to the program facilitator, one of the other students in the program was not sure whether Haley was one of the "social coaches" due to the help she provided.  During the second year of the program, she was very engaged and volunteered feedback during group sessions.

Haley's emphasis from receiving a regular diploma to receiving an alternative diploma.

For the first time, Tia refused to sign the IEP.  Among other things, she expressed concern that the school was modifying its math curriculum too much for Haley.  At that time, Haley was enrolled in a mainstreamed mathematics course, Integrated Math I, which covered topics including surface area, volumes, three-dimensional graphing, and linear and exponential equations.  Tia believed that Haley should be learning "functional" math instead, which would teach her the skills needed to balance a checkbook or create a monthly budget.  To address Tia's concerns, the District explored the availability of placing her in math classes at another high school, such as Noble High School in nearby North Berwick, Maine.  To attend classes at Noble High School, however, Haley would have to take a bus there, and Tia did not want her to do so.  That suggestion was, therefore, ultimately abandoned.

The District also agreed to have its speech-language pathologist evaluate Haley.  The speech and language evaluation, conducted in February 2010, placed Haley's core language score in the average range.  Haley scored in only the fifth percentile for Pragmatic Judgment, however (an age equivalent of less than eleven years old), the fifth percentile for Understanding Spoken Paragraphs, and the ninth percentile for Formulated Sentences and

the Language Memory Index.  The evaluation did not make any
specific recommendations for Haley.

The District held another IEP meeting for Haley on February
17, 2010, to review the results of the speech and language
evaluation.  At the meeting, the District acknowledged that
Haley's "pragmatic skills are a weakness," Admin. R. at 749, but
did not enhance her IEP in any way.  It instead opted to continue
her 30-minute speech-language consultation and participation in
the S-Cubed program.

Tia again refused to sign the proposed IEP.  On March 1,
2010, a family friend (and Maine attorney) wrote the District's
superintendent expressing the opinions that the IEP "does not
appear to reflect or address a number of serious deficiencies"
and that the district had failed "to provide Haley with a
comprehensive and current assessment . . . [as] required by
federal law."  Id. at 780-81.  On March 15, 2010, believing that
Haley required services beyond what was being proposed or
provided, Tia submitted an application to enroll Haley in a
private residential summer program at the Riverview School in
Hyannis, Massachusetts.

Around the same time, the District's psychologist performed
psychoeducational testing of Haley.  That testing indicated that,
compared to peers her age, Haley was functioning below the

17

average range in social and communication skills, community
skills, motor skills, and personal living skills.  It further
indicated that Haley exhibited withdrawal in social situations,
rigidity in problem solving, socially offensive behavior,
difficulty being flexible when things did not go as she expected,
and anxiety.  Haley also participated in an academic assessment,
which measured her math composite standard score in the fourth
percentile.  Otherwise, Haley's results on the academic
assessment placed her in the average range.

Haley's IEP team met again on March 29, 2010.  At the
meeting, the District changed Haley's IDEA eligibility category
from "other health impairment," see supra n.4, to "specific
learning disability in math."  It did not, however, make any
changes to Haley's special education or related services.

At a subsequent IEP team meeting on April 27, 2010, Tia
asked the District to provide Haley with direct speech-language
services for pragmatics and social communication.  The district
rejected this request.  However, it revised Haley's IEP to offer
her summer school services, in which she would receive assistance
in math and social skills for three hours per day, three days per
week from July 6, 2010 through August 5, 2010.

On May 7, 2010, Tia rejected the IEP again.  The following
month, she wrote to the superintendent of the District to express

her view that Haley's IEP was not meeting her needs, and giving notice of her intent to place Haley in the summer program at the Riverview School starting on July 9, 2010.  The letter also notified the superintendent of Tia's intent to seek reimbursement from the District for all costs associated with this placement, which, Tia wrote, was "designed to provide compensation for the district's failure to provide Haley with an appropriate education."  Admin. R. at 883.

On June 22, 2010, the District convened an IEP team meeting with Tia to discuss her concerns about Haley's IEP.  At the meeting, the district proposed placing Haley in a mainstreamed math class--Integrated Math II--for one semester of her eleventh grade year, and again proposed that Haley attend summer school and an assisted study hall.  The district also refused Tia's request to fund Haley's participation in the Riverview School summer program.  It did, however, offer to provide Haley with post-graduate programming that would enable her to obtain a regular diploma while meeting other, non-academic needs.

Haley successfully completed her tenth grade year.  She received passing grades in her pass/fail courses, and A's and B's in her other courses--including a B in mathematics--grades her teachers testified that she earned on her own and were not altered in any way.  Haley's teachers also testified that her

19

tests were not modified to enable her to pass them.  Over the course of the year, Haley's score on MAP, a standardized math examination, increased from 195 to 218 points--a 23-point jump, well over the average increase of seven or eight points.  At the end of the year, the District promoted her to the eleventh grade. Tia testified at the hearing that, notwithstanding these apparent successes, in her opinion Haley had not "absorbed anything throughout the year" due to her stress level.  Admin. R. at 1729.

>D.   **The Riverview School (Summer 2010)**

Haley began attending the Riverview School's summer program on July 9, 2010.  She exhibited great enthusiasm about the program.  Her teachers at Riverview observed that Haley was supportive to her dormitory mates, readily volunteered, and was excited to participate in daily activities.  She formed friendships with fellow students in the first week at Riverview, and staff reported that by the end of the program, Haley had become "a wonderful role model to her peers," who would seek Haley out for advice.  Admin. R. at 933.  Tia also testified at the due process hearing that Haley had formed "real bonds" with the other students at Riverview and had exhibited renewed confidence and enthusiasm after returning home from the summer program.  Id. at 1731-32.

Over the course of the Riverview program, Haley participated in a language arts class in which she received instruction on written language skills; a reading class in which she received instruction on reading comprehension; a math class in which she received instruction on basic math skills; and art, music, and physical education classes.  Haley's math instructor at Riverview reported that Haley had "improved her ability to quickly recall multiplication math facts and efficiently apply them and her improved mental math skills to solve complex multiplication and division problems."  Id. at 929.  He further reported that Haley had mastered the ability to apply mathematical principles to solve word problems or simulated situations and to use a calculator to check her answers to problems.

**E.    Eleventh grade (2010-2011)**

In September 2010, Haley returned to Somersworth High School for her eleventh grade year.  Prior to beginning the school year, Haley experienced anxiety about the prospect of attending school at Somersworth again (and, in particular, taking math class); that anxiety continued into the school year.  Haley again received the same IEP services the District had provided for the previous two years.  In late September, Tia rejected two new proposed IEPs for Haley, neither of which offered any new programming.

21

Shortly before Haley began attending the Riverview School, Tia had scheduled an independent evaluation for Haley with a neuropsychologist.  That evaluation, which began in early July 2010, was completed in mid-September 2010; because of the timing of the evaluation, the psychologist did not have the opportunity to observe Haley in an educational setting at Somersworth High School.  The evaluation diagnosed Haley with Asperger's Syndrome.

In early October 2010, Haley's IEP team met to review this evaluation.  The District agreed that Haley was also eligible for IDEA services due to autism.[6]  In light of the psychologist's recommendation that Haley be taught math on a tutorial basis, the District offered to instruct Haley in math using the "Plato" program, a self-paced program of instruction using computer tutorials and one-on-one tutoring to teach math skills.  The District refused Tia's request for direct social skills instruction, though, instead opting to place Haley in the S-Cubed program again.  Tia promptly rejected the IEP offered by the District after this meeting.

---

[6] The school psychologist disagreed with Haley's diagnosis of Asperger's Syndrome, but that disagreement is immaterial to the issues presented in this case, given that the District agreed to accept that diagnosis.  Tia believed autism should be Haley's primary disability coding; however, the District accepted it only as a secondary disability.  But that, again, is immaterial to the issues presented in this case.

The District held a final IEP team meeting for Haley on October 26, 2010.  At the meeting, Tia explained that Haley had been very stressed at home, and had been engaging in "bizarre" behavior.  Admin. R. at 1101.  She also explained that Haley's English class--which had historically been an area of relative academic strength for her--had become very difficult for her.

After the meeting, the District issued a new proposed IEP that included an assisted study hall, recreational therapy from the Northeast Passage program once a week (in which Haley would interact in a group setting with her peers and local community), and a life skills class (in which Haley would be instructed in cooking, shopping, safety, household chores, budgets and bank accounts, and social skills, among other things).[7]  The life skills class offered some additional mathematics support, and the IEP also contained two options for Haley to complete her math requirement:  Integrated Math II or Plato.  The proposed IEP also recommended a reduction in Haley's course load to two mainstreamed academic courses at a time to lessen her anxiety.  That reduction, if accepted, would have extended Haley's graduation date.  The proposed IEP also included a period of summer education, during which Haley would receive additional

---

[7]Haley enrolled in and began attending this class during her eleventh-grade year, before ultimately leaving the high school.

23

life skills and speech pathology instruction.  In addition to a
calculator, the proposed IEP also allowed for the use of a laptop
computer to aid Haley in note-taking during class.

On November 18, 2010, Tia rejected the proposed IEP.  That
same day, she notified the District of her intent to unilaterally
place Haley at the Aucocisco School in Cape Elizabeth, Maine, a
state-approved special education day school with 36 students, and
to seek reimbursement from the District for that placement.  The
District held a "resolution session" on December 1, 2010, and,
although Tia informed the District that she would consider
allowing Haley to remain at Somersworth High School under certain
conditions, she ultimately decided that Haley's academic and
transitional needs could not be met there.  According to Tia, it
appeared as though the amount of stress Haley was experiencing
was rendering her unable to function effectively.

On December 3, 2010, Haley attended her last day at
Somersworth High School.  According to Haley's case manager,
Haley was sad that she was leaving.  Witnesses testified that
Haley appeared to enjoy her last day at the high school;
according to Tia, Haley said the reason she was happy was because
it was the last day she had to spend there.  At the time she left
Somersworth High School, Haley was earning a C+ grade in her

English course, As and Bs in her other graded courses, and a
passing grade in her pass/fail course.

    **F.    The Aucocisco School**

    Haley began classes at the Aucocisco School on December 6,
2010.  Most of the students at Aucocisco have learning
disabilities, attention disorders, high functioning autism
spectrum disorders, and/or anxiety disorders.  Because Haley had
been privately placed at Aucocisco, the school did not develop an
IEP for her, and because the school year had already started, it
placed Haley into the existing curriculum of classes.  Those
classes included "community resources," in which students met in
community settings to practice their social judgment and problem
solving skills with Aucocisco's speech-language pathologist, and
a "transitions" class focusing on skills for living independently
after high school.  Haley was also instructed in mathematics
using the "Sharma" method of math instruction, which is geared
towards students who, like Haley, lack a firm number sense and
computational basics.  Haley also worked on creating her own
webpage with Aucocisco's technology coordinator as part of an
independent study, and participated in world history, art,
health, physical education, film appreciation, and English
classes, as well as a study hall.

Aucocisco's director testified that Haley needed more
support, and was less independent, in mathematics than in any
other course, consistent with her academic history.  To instruct
Haley in mathematics, the school's staff made an effort to find
gaps in Haley's mathematics knowledge and fill those gaps before
instructing her in more advanced concepts.  They found that
although Haley had memorized concepts, she did not understand
those concepts--including double-digit subtraction--"at a
concrete level."  Melnick Depo. (document no. 19-1) at 23:23-
24:8.  Aucocisco's director opined that, because of Haley's
higher verbal skills, she had been able to give her teachers a
contrary impression that she understood mathematical concepts.

To combat Haley's deficits, Aucocisco's staff, using the
Sharma method, went "all the way back . . . to kindergarten and
first grade concepts."  Id. at 22:5-6.  Over the course of the
year, the school instructed Haley in double digit multiplication,
long division, and basic geometry, among other concepts, using
the Sharma method of individualized instruction and a web-based
program, Symphony math.  Once Haley had mastered a concept, the
school moved onto a more advanced one.  Aucocisco's director
testified that Haley had to overcome "initial anxiety" about
math, but eventually "became comfortable with the notion that she
could succeed in math" and achieved "small gains."  Id. at 39:19-

41:13.  Despite these gains, the director opined that Haley would need additional foundational instruction in mathematics.

Haley had an overall positive experience at the Aucocisco School.  She became more enthusiastic, and less anxious, about attending school and participating in the activities offered there.  According to the director of the school, Haley "blossomed emotionally" over the course of her time there; while she had started out "[e]xceptionally anxious" and had "very few interactions with peers," she eventually "came out of her shell" and "became part of the group."  Id. at 10:12-24.  Haley participated in several extracurricular activities, including a bowling club and chorus.  The director also testified that Haley exhibited "huge gains" in her ability to function appropriately with her peers, id. at 52:12, and Tia testified that Haley made close friends among the students at Aucocisco, including her first boyfriend.  Tia also testified that objectively, she observed "a marked improvement in Haley's attitude, in her optimism, in her amount of energy" and that Haley "became more extroverted, more talkative, generally happier."  Pass Depo. (document no. 19-2) at 7:16-20.

According to the plaintiff, Haley attributed her enthusiasm for Aucocisco in part to smaller class sizes (Aucocisco has about a three-to-one student-to-teacher ratio, and academic classes

27

consist of only four to five students), which enabled her to get more one-on-one help from her teachers.  She also attributed her enthusiasm to feeling more like she belonged at Aucocisco (as opposed to Somersworth) because she was not bullied, and the other students were nice to her.

### G.   Procedural history

Tia filed an administrative due process complaint with the New Hampshire Department of Education on October 5, 2010, shortly after Haley began her eleventh grade year at Somersworth High School.  The complaint sought reimbursement for Haley's unilateral placement at the Riverview School summer program. Shortly thereafter, Tia was granted leave to amend the complaint to add allegations regarding Haley's IEP for the 2010-2011 school year.  As amended, the due process complaint alleged that Haley's 2009-2010 and 2010-2011 IEPs, as designed, were inappropriate to address Haley's special education needs.  Tia also sought to challenge the appropriateness of Haley's IEP for the 2008-2009 school year, a claim which, though not apparent from the face of the complaint, emerged through later filings.  The complaint sought an award of compensatory educational services, including reimbursement of the costs incurred with Haley's placements at the Riverview and Aucocisco Schools.

A hearing officer appointed by the Department of Education held a due process hearing on Tia's complaint on January 11 and 26-27, 2011.  Prior to the hearing, the District submitted affidavits from several of the staff members at Somersworth High School and a recreational therapist.  At the hearing, plaintiff presented her own testimony; the testimony of Dr. Richard Doiron, the neuropsychologist who evaluated Haley during the summer she attended Riverview; and Barbara Melnick, director of the Aucocisco School.  The District presented the testimony of Kathryn Francoeur, facilitator of the S-Cubed program; Cynthia Monahan, Haley's case manager; Lisa Payeur, a special educator at Somersworth High School; Brenda Aubin, job coach with the Somersworth High School special education program; Matthew Frye, a certified therapeutic recreation specialist; Priscilla Abbott, Somersworth High School's psychologist; Bob Marquis, the District's Director of Special Education; and a number of Haley's teachers at Somersworth High School.

On February 9, 2011, the hearing officer issued a written order concluding that Haley's "social and emotional issues were addressed at school" and that she had "made more than minimal progress academically" under the IEPs.  Admin. R. at 2275.  The hearing officer further observed that "there was no evidence that the student could have made more progress or had better results

29

in any area had she received other services that were not provided." Id.  The hearing officer therefore concluded that Tia had failed to establish that the District did not provide Haley with a FAPE, and rejected both reimbursement claims.

Tia filed this action on June 8, 2011.  On Tia's motion, this court granted the parties leave to supplement the record with evidence of Haley's progress and performance at the Aucocisco School from the date of the due process hearing through the end of the 2010-2011 school year.  See Order of Oct. 7, 2011; see also 20 U.S.C. § 1415(i)(2)(C)(ii).  In accordance with that order, Tia submitted progress reports from the Aucocisco School, a Symphony Math student home report, and transcripts of her own deposition and that of Ms. Melnick.  The District submitted transcripts of the depositions of Devin McNelly, chair of the mathematics department at Somersworth High School, and Sharon Lampros, principal of Somersworth High School.  The parties subsequently filed lists of disputed facts, decision memoranda, and reply briefs, see L.R. 9.3(d) and (e), and this court held oral argument.

## III. **Analysis**

As noted at the outset, the key issues in this case fall into three categories:  (1) whether parts of the plaintiff's claim are procedurally barred, by either the statute of

30

limitations or the doctrine of waiver; (2) whether the IEPs the
District developed were reasonably calculated to provide Haley
with a FAPE; and (3) if not, whether tuition reimbursement for
the plaintiff's unilateral placements at Riverside and Aucocisco
is the appropriate remedy.  As set forth below, the court agrees
with the District that the statute of limitations bars the
plaintiff's challenges to Haley's ninth-grade IEP and its
subsequent amendment, but concludes that neither the statute of
limitations nor the doctrine of waiver bars any of her remaining
challenges.  The court also agrees with the District that Haley's
tenth- and eleventh-grade IEPs were reasonably calculated to
provide her with a FAPE.  As a result, the plaintiff cannot
recover tuition reimbursement.

### A.   Whether the plaintiff's claims are procedurally barred

#### 1.   *Statute of limitations*

Pursuant to 20 U.S.C. § 1415(f)(3)(C), an IDEA complainant
must request an impartial due process hearing within either "2
years of the date the [complainant] knew or should have known
about the alleged action that forms the basis of the complaint"
or the time period, if any, specified by State law.  New
Hampshire has adopted such a limitations period, though it is
substantively the same as the federal period:

> Any action against a local school district seeking to
> enforce special education rights under state or federal

law shall be commenced by requesting an administrative
due process hearing from the department of education
within 2 years of the date on which the alleged
violation was or reasonably should have been
discovered.

N.H. Rev. Stat. Ann. § 186-C:16-b, I.  The District, invoking

these provisions, argues that the plaintiff may not seek relief

based on events occurring prior to October 5, 2008--two years

before the date on which she filed her administrative due process

complaint.  This would serve to bar the plaintiff's claim insofar

as it is based on (a) the April 8, 2008 IEP for Haley's ninth

grade year of school, and (b) the October 2, 2008 amendment to

it.  (The District concedes that the plaintiff would still be

able to bring a claim based upon Haley's tenth- and eleventh-

grade IEPs, which were designed after October 5, 2008.)

The court agrees that the statute of limitations bars any

challenge to the plans in question.  At the due process hearing,

the plaintiff had the following exchange with her attorney:

Attorney O'Meara:  Look at page 104 there's your
signature [on the April 8, 2008 IEP].  And the ... the
school's raised an argument about your signature on
these IEPs.  I want you to describe when you signed
[the April 8, 2008 IEP] what was your understanding of
what you were signing?

Ms. Pass:  Um ... When I signed the IEPs I didn't
realize that I was signing ... a document that ... that
I was signing off on everything that was here as well
as everything that wasn't here.  So I assumed that I
was agreeing or consenting to the things that were here
to allow those to happen.

32

> Attorney O'Meara:  Did you hold the belief that what
> was being offered [in the April 8, 2008 IEP] was not
> all that [Haley] needed?
>
> Ms. Pass:  I definitely was very concerned that we lost
> the services from the transition from Maine to North
> Carolina to here and <u>felt that she needed more</u>.

Admin. R. at 1705 (emphasis added).  As of April 8, 2008, then,
the plaintiff believed that the IEP did not provide enough
services, and that Haley "needed more"--the selfsame deficiency
upon her IDEA claim is premised.  In other words, on that date,
she discovered the District's alleged IDEA violation, thus
triggering the running of the limitations period.[8]  Because the
plaintiff did not file her administrative due process complaint
with the state Department of Education until October 5, 2010,
well over two years later, her challenge to the April 8, 2008 IEP
is untimely.

---

[8]The plaintiff argues that the date on which she reasonably
should have discovered the allegedly deficient design of Haley's
IEP occurred at some indeterminate point after October 4, 2008
(two years and one day before she filed her complaint with the
state Department of Education).  She notes that "[a]t that point,
Haley's freshman year at Somersworth High School was barely one
month old and the indicators of her difficulties with the high
school program were only beginning to emerge."  Pl.'s Reply Memo.
(document no. 31) at 2.

This argument has some appeal.  After all, a parent or
guardian who lacks expertise in the field of special education
may not be able to recognize an IEP's deficient design until the
IEP is implemented and problems begin to emerge.  Here, however,
the court cannot overlook the plaintiff's own testimony that she
did, in fact, appreciate defects in the IEP immediately.

33

It follows that the plaintiff's challenge to the October 2, 2008 amendment to that IEP is also untimely.  If the plaintiff believed that the April 8 IEP did not offer Haley enough services, she necessarily must have believed that the October 2 amendment was similarly insufficient:  as discussed in Section II.B, supra, that amendment added no new goals or services, and in fact dropped Haley's reading goals.  Thus, the plaintiff discovered or "reasonably should have" discovered any alleged deficiency in the IEP amendment when she signed it on October 2, 2008, and her challenge to the amendment, filed over two years later, is barred by the statute of limitations.  The court can therefore consider only Haley's tenth- and eleventh-grade IEPs in the remainder of this order.

### 2.  *Waiver*

The District also argues that the plaintiff waived her right to challenge the first IEP it developed for Haley's tenth-grade year, dated September 24, 2009.  The plaintiff, the District argues, consented to that IEP in writing and without exception, and did not revoke that consent before seeking a due process hearing.  (Again, the district concedes that its waiver argument would not bar the plaintiff from pursuing her claim based upon the allegedly deficient design of Haley's subsequent IEPs, to which she did not consent.)  This argument is not persuasive.

The District proceeds from a faulty premise:  it argues, repeatedly, that the first time the plaintiff "voiced a formal objection" to the September 24, 2009 IEP was when she filed her due process complaint on October 5, 2010.  Def't's Decision Memo. (document no. 29) at 11; see also id. at 12 ("On October 5, 2010, in the filing of the due process Complaint, for the first time, the Guardian attempted to revoke her consent to [the September 24, 2009 IEP].");  id. at 13 (Here, the Guardian   . . . never rejected the IEP[] during [its] term.").  That is incorrect. Although the plaintiff initially consented to the September 24, 2009 IEP, less than two months later, in mid-November 2009, she e-mailed Haley's case manager to express her concern that the IEP was not sufficient to address Haley's social skills deficits. Immediately upon receiving the case manager's response to that e-mail on November 19, 2009, the plaintiff requested an IEP team meeting.  She repeated that request again in January 2010 when the case manager failed to respond to her earlier request.  And, after the District revised Haley's IEP following the requested meeting--leaving it substantially unchanged, but for the addition of a weekly speech-language consultation--the plaintiff refused to consent to the proposed IEP.

These actions are hardly consistent with waiver--the "intentional relinquishment or abandonment of a known right or

35

privilege." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 10 (1st Cir. 2007) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)n).  To the contrary, they establish a clear record of objections to the design of the September 24, 2009 IEP, which unequivocally indicates an intention not to relinquish the right to challenge it.  The District implies that this record was insufficient to revoke the plaintiff's initial consent, but it is unclear to the court what more the plaintiff could have done to make clear her dissatisfaction with the IEP.  Under these circumstances, she did not waive her ability to challenge the design of the September 24, 2009 IEP.  See Alexandra R. ex rel. Burke v. Brookline Sch. Dist., 2009 DNH 136, 8-9 (parents did not waive right to challenge IEP where they "repeatedly objected to the content of [student's] educational programming" and "filed their hearing request within the limitations period").[9]

---

[9]The principal cases upon which the District relies all deal (directly or indirectly) with the effect of a parent's failure to raise any objection whatsoever to an IEP during its term, and are thus inapposite.  See Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F. Supp. 2d 185, 194-95 (D. Mass. 2010); C.M. ex rel. J.M. v. Bd. of Pub. Educ. of Henderson Cnty., 184 F. Supp. 2d 466, 484 (W.D.N.C. 2002); McDowell ex rel. McDowell v. Fort Bend Indep. Sch. Dist., 737 F. Supp. 386 (S.D. Tex. 1990).  (Curiously, the District also cites Town of Burlington v. Dep't of Educ. for the Commonwealth of Mass., 736 F.2d 773, 796-97 (1st Cir. 1984), which appears to have no relevance to the waiver question.)

The District has also argued, in passing, that the doctrines of estoppel and laches bar the plaintiff from challenging the September 24, 2009 IEP because she unreasonably delayed taking action to remedy its alleged deficiency.  But that argument, too,

This is not to say that the plaintiff's failure to object to the September 24, 2009 IEP at the time it was proposed is wholly irrelevant.  As the Court of Appeals for the Third Circuit has noted, "parents' failure to press their objections to [an] IEP when it was offered" may "cast[] significant doubt on their contention that the IEP was legally inappropriate since it suggests that the parents were also unaware prospectively that the . . . IEP was unlikely to confer educational benefit." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 536 n.8 (3d Cir. 1995).  The court will accordingly take the plaintiff's early silence as to the IEP's sufficiency into account when considering, in the next section, whether it satisfied the District's obligations under the IDEA.

**B.   Whether the IEPs conform to the IDEA's requirements**

With the proper scope of its review confirmed, the court now turns to the primary issue presented in this case:  whether the IEPs the District proposed on September 24, 2009 and thereafter complied with the IDEA.  As already mentioned, a school district

---

is premised on the incorrect notion that the plaintiff "neglected to challenge [the September 24, 2009 IEP] before [it] lapsed." Def't's Decision Memo. (document no. 29) at 14.  As already discussed, the plaintiff voiced her concerns with the IEP within two months.  Given that the IDEA envisions a "collaborative," non-confrontational process for developing an IEP, Lessard, 518 F.3d at 26, the plaintiff did not act unreasonably in pursuing informal means of resolving her dispute before filing suit.

discharges its duty to offer a child a FAPE "as long as the program that it offers to a disabled student is reasonably calculated to deliver educational benefits." Five Town, 513 F.3d at 284 (internal quotations omitted).  "However, an IEP need not be designed to furnish a disabled child with the maximum educational benefit possible"; it need only "confer a meaningful educational benefit." Sebastian M., 685 F.3d at 84 (emphasis added); see also Lessard, 592 F.3d at 270 ("[A]n ideal or perfect plan is not required.").  "[A]n IEP which places a pupil in a regular public school program will ordinarily pass academic muster as long as it is 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" Lenn, 998 F.2d at 1086 (quoting Rowley, 458 U.S. at 204).

In evaluating an IEP, "the underlying judgment of those framing the plan is given considerable weight." Lessard, 592 F.3d at 270.  "The standard of review is thus deferential to the educational authorities, who have 'primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs.'" Id. (quoting Rowley, 458 U.S. at 207).

The Department of Education hearing officer concluded that the District had satisfied its obligation, finding that Haley's "social and emotional issues were addressed at school" and that

she "made more than minimal progress academically," and further noting that there was "no evidence that [Haley] could have made more progress or had better results in any area had she received other services that were not provided."  Admin. R. at 2275.  The plaintiff argues that the hearing officer erred by focusing on whether Haley "made progress"; this, she says, "[i]mposed an improperly high legal burden."  Pl.'s Decision Memo. (document no. 30) at 5.  Had the hearing officer properly considered whether Haley's IEPs were reasonably calculated to deliver a meaningful benefit, the plaintiff contends, he would have concluded that they were insufficient to address Haley's social and academic needs, and that she in fact suffered emotional harm from them.  The court cannot agree.

To begin, the plaintiff misconstrues the significance of the hearing officer's reference to "progress."  The court does not take this reference to suggest that a parent or guardian must demonstrate that the student failed to make progress in order to successfully challenge an IEP, or that a showing that the student made progress is sufficient to defeat such a challenge.  Instead, the hearing officer was making an observation about the evidence, in response to the arguments the plaintiff had advanced (i.e., that Haley had not made progress).  And this observation was, in any event, entirely proper:  the IDEA requires school districts

to "ensure that [a] child be placed in a program that provides opportunity for some educational progress." Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983). "Hence, educational results are relevant to determining the efficacy of educators' policy choices," although this, of course, "is not the only indici[um] of educational benefit," and other factors must also be considered. Roland M., 910 F.2d at 991-92; see also Lessard, 518 F.3d at 29 ("Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE.").[10]

When considered in its entirety, the record evidence--including evidence of Haley's progress both academically and socially--supports the hearing officer's conclusion. Although the court appreciates the excellent advocacy of the plaintiff's counsel (both in his written memoranda and at oral argument), it concludes that Haley's IEPs were reasonably calculated to confer a meaningful educational benefit with respect to Haley's academic

---

[10]The plaintiff's suggestion that the hearing officer did not consider whether the IEPs provided "a meaningfully beneficial education," Pl.'s Decision Memo. (document no. 30) at 6, is also off the mark.  In granting the District's proposed rulings 4, 5, and 9, the hearing officer concluded that (1) the IEPs for Haley's tenth and eleventh grade years were "reasonably calculated to enable [Haley] to benefit from her education" and (2) the plaintiff "failed to show that any of [Haley's IEPs] were inadequate in that they had no reasonable possibility of benefiting [her]."  Admin. R. at 2254-55, 2277.

and social needs.  The court also concludes that, contrary to the
plaintiff's position, the IEPs did not cause harm to Haley.

### 1. *Haley's academic needs*

As noted, Haley's principal area of academic concern was in
mathematics.  To explain the court's conclusion that the IEPs in
question were reasonably calculated to meaningfully benefit Haley
in this area,[11] it is necessary to first revisit the context in
which those IEPs were formulated.

As detailed in Part II, <u>supra</u>, Haley had historically
struggled with mathematics, and her achievement test scores
consistently placed her mathematics ability well below average.
When she entered the Rollinsford school system in 2006--her
seventh-grade year--the District adopted, with the plaintiff's
consent, a modified form of Haley's existing IEP.  Under that
plan, Haley was mostly mainstreamed with her non-disabled peers,
but received academic support for her mathematics and (then-

---

[11]In focusing on the adequacy of the District's IEPs with
respect to Haley's mathematics needs in this section, the court
does not mean to suggest that the instruction the District
provided Haley in other academic disciplines, or her achievement
in those disciplines, is irrelevant to the inquiry at hand.  A
school district plainly would not satisfy its obligation to
provide a FAPE by concentrating its efforts solely on a student's
identified areas of need to the exclusion of all other areas.
Here, however, the parties have chosen to concentrate their own
efforts on the District's provision of mathematics instruction to
Haley, and the court follows suit.  Based upon its review of the
record, the court is satisfied that the District provided Haley
with an appropriate education in other academic disciplines.

existing) language arts needs in the special education learning center for ten hours per week, as well as another three hours per week of supported study.  See Admin. R. at 561-66, 575-83.  She also received minor accommodations to her testing environment. See id. at 577-79.  Under this IEP (about which the plaintiff raises no concerns), Haley demonstrated sufficient academic achievement, including in mathematics, to be promoted to the eighth grade.

When the time came to develop an IEP for Haley's eighth grade year, the District--again with the plaintiff's consent--essentially maintained this program, albeit with reduced hours. Haley received mainstreamed mathematics instruction alongside her non-disabled peers, with some in-class assistance as well as thirty minutes per day of supported study.  See id. at 586-605. Once again, under this plan (about which the plaintiff again raises no concerns), Haley demonstrated sufficient academic achievement to be promoted to the next grade.  To be sure, this was not without some difficulty along the way:  the plaintiff testified that Haley struggled with her math homework and needed reinforcement at home.  Id. at 1703.  Her IEP progress reports for the year, too, noted that Haley "need[ed] support and modification" (including "us[ing] a calculator to save time"), but also mentioned that she "seem[ed] comfortable" in a

42

mainstreamed mathematics course and "demonstrated strong growth overall." Id. at 607, 612, 615-16.

In short, by the time Haley entered high school, she had, by objective indicators, demonstrated the ability to be successful in a mainstreamed mathematics classroom, provided she was given access to appropriate accommodations and support services. Unsurprisingly, then, the IEP the District developed for Haley's ninth grade year followed this same pattern, mainstreaming Haley alongside her non-disabled peers, where she received small-group reinforcement with paraprofessionals as well as a ninety-minute daily assisted study hall (or "academic skills" class). See id. at 630-40; 660-73; 1816. During that ninety-minute period, Haley received assistance in mathematics, among other things, from special education staff members. Id. at 1839-40. She was again given minor accommodations, see id. at 637; 667, and was again promoted to the next grade, having completed her mathematics competencies and received a B in her mathematics course that year, see id. at 147, 623-26, 894. Although the plaintiff now contends that this IEP was inadequate (a claim which is barred by the statute of limitations, as discussed in Part III.A.1, supra), she consented to its implementation, and raised no concerns about its supposed inadequacies over the course of the school year.

This was the backdrop against which the District formulated the September 24, 2009 IEP for Haley's tenth-grade year, the first of the IEPs now at issue in this case.  In light of Haley's track record of apparent success under the IEPs just described, and giving the appropriate level of deference to the hearing officer's opinion, see Roland M., 910 F.2d at 989, the court cannot say that the September 24, 2009 IEP (or any of those that followed) was inappropriate or inadequate.  That IEP maintained the same essential components:  mainstreaming Haley with her non-disabled peers, giving her access to additional assistance in an assisted study hall, and providing accommodations similar to those she received the previous year.  See Admin R. at 700-14.

The plaintiff suggests this was inappropriate because Haley was not "provided . . . with anything different from the standard math curriculum."  Pl.'s Reply Memo. (document no. 31) at 6.  In so suggesting, though, the plaintiff ignores the fact that "[t]here is no mechanical checklist by which an inquiring court can determine the proper content of an IEP." Lessard, 518 F.3d at 23.  "IEPs are by their very nature idiosyncratic," id. (internal quotation marks omitted), such that, while something "different from the standard math curriculum" may be necessary for one student, the standard math curriculum, in connection with support services and accommodations, may be well-suited for

44

another.  Indeed, the IDEA expresses a preference for "education
in regular classes with the use of supplementary aids and
services," 20 U.S.C. § 1412(a)(5)(A), and Haley's educational
history tended to indicate that she could flourish in such an
environment.  Plaintiff, moreover, again raised no objections to
this IEP at the time of its formulation--a fact that, as already
discussed, lends support to the conclusion that the IEP was not
inappropriate when viewed ex ante.  See Carlisle Area Sch., 62
F.3d at 536 n.8.

        The testimony the plaintiff has since adduced does not
undermine that conclusion.  Neither Dr. Doiron, the psychologist
who examined Haley, nor the director of the Aucocisco School (the
only practicing educator to testify on the plaintiff's behalf)
clearly identified any particular areas in which the September
24, 2009 IEP or any of its successors failed to provide Haley
with an adequate mathematics education.  Dr. Doiron did suggest
that the District could have played to one of Haley's strengths
by using computers to instruct her, Admin. R. at 1634 (a
suggestion that, he later admitted, the District had incorporated
into at least one of the IEPs that the plaintiff rejected, see
id. at 1652, 1661-62).  He did not, however, testify that this
was necessary to provide a meaningful educational benefit to

45

Haley.[12]  In contrast, the educators who testified on the District's behalf opined that the IEPs in question were calculated to provide such a benefit as written.  See, e.g., id. at 148-160, 197-203.

The results Haley achieved during her tenth grade year, moreover, seem to have validated those opinions.  Haley again received a passing grade in her mathematics class--indeed, her teacher characterized Haley as "one of the highest performing students in the class."  Id. at 153; see id. at 894, 896-99. Notably, her standardized test scores exhibited substantial, above-average growth.  See id. at 153, 170, 2038.  So, in formulating Haley's later IEPs--including the proposed IEPs for Haley's eleventh grade year, see id. at 861-80--it was not unreasonable for the District to adhere to the same, theretofore successful plan, in the expectation that doing so would continue to be of educational benefit.  Cf. Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 53 (1st Cir. 1992) (IEPs appropriate where, among other things, they did not provide fewer services than previous IEPs that had addressed the student's problems).

---

[12]Dr. Doiron conceded that he was not an educator or a special educator, and lacked any teaching certificates, Admin. R. at 1638, so it is unclear what qualifications, if any, would have enabled him to render such an opinion anyway.

46

The plaintiff questions the record evidence of Haley's academic success, asserting that Haley was able to obtain passing grades only with "intensive assistance from her family and outside providers."  Pl.'s Decision Memo. (document no. 30) at 15; see also id. at 8 n.6 (claiming Haley received "intensive assistance . . . from her family and others").  Her list of disputed facts and legal memoranda, however, identify only two pieces of evidence that arguably support this assertion--the plaintiff's own testimony that Haley once told her that she "got help at school" on a single competency exam, id. at 15 (citing Admin. R. at 1736), and an academic assessment that noted that Haley received good grades in part due to "help from guardians at home," Pl.'s List of Disputed Facts (document no. 26) at 17 ¶ 55 (citing Admin. R. at 828, 2276).  This evidence is ambiguous at best, and even when construed in the plaintiff's favor it does not establish that Haley received "intensive assistance" as the plaintiff claims.  At best, it establishes that Haley received occasional help and guidance from her teachers and family, which is hardly remarkable.  Cf. Michael D.M. ex rel. Michael M. v. Pemi-Baker Reg. Sch. Dist., 2004 DNH 128, 14 ("[The child] is a special needs student with an IEP; it is, therefore, not surprising that his work is reviewed by his teachers, nor is it

unusual (or inappropriate) that he is given special instruction and direction aimed at improving his academic work.").

Haley's teachers repeatedly denied doing Haley's work for her and testified that Haley earned her grades.  See, e.g., Admin. R. at 157, 169-70, 1821, 2129.  The plaintiff has identified no specific evidence that rebuts this testimony. Instead, she asks the court to infer that Haley must have received help based on testimony by the Aucocisco School's director identifying substantial gaps in Haley's mathematics understanding.  Pl.'s Decision Memo. (document no. 30) at 8 n.6, 15-16.  Significantly, though, the director testified that Haley had been able to memorize mathematical operations and could perform them such that she would "seem to have it" in class in a way that might "fool" her teachers.  Melnick Depo. (document no. 19-1) at 23:23-25:18; see also id. at 28:23-28:25.  This is entirely consistent with other evidence that Haley did her own work and objectively exhibited the ability to perform the tasks expected of her.  The plaintiff also points to standardized test scores that consistently place Haley's mathematics ability in the single-digit percentile range.  Pl.'s Decision Memo. (document no. 30) at 8 n.6.  But it is not inconceivable, or even out of the ordinary, that a student who scores so poorly on standardized tests in comparison to his or her peers might nonetheless achieve

passing grades in a basic, grade-level mathematics course without assistance, at least when that student is an exceptionally hard worker--as everyone agrees Haley is.

The court is cognizant that "even a handicapped child that [is] receiving passing marks and reasonably advancing from grade to grade might not be receiving [a FAPE]." In re Conklin, 946 F.2d 306, 313 (4th Cir. 1991). The evidence that Haley did not understand mathematics at a conceptual level, and had apparently succeeded only in memorizing how to perform mathematical operations without appreciating their purpose, is troubling. It does raise questions about how Haley's progress and performance were measured. But there is no evidence before the court that the District could have--let alone should have--measured Haley's performance in a different way, or that it should have apprehended how severe her disability truly was despite her outward signs of understanding.

As our Court of Appeals has emphasized, "[a]n IEP is a snapshot, not a retrospective," and must be judged on the basis of "what was, and was not, objectively reasonable . . . at the time the IEP was promulgated." Roland M., 910 F.2d at 992. Had the District offered the IEPs in question after learning of the substantial gaps in Haley's understanding, the plaintiff would have a much better argument that they were inappropriate. But in

light of Haley's ability to objectively meet expectations in a mainstreamed mathematics course with some minor accommodations and support, the court concludes that at the time the IEPs in question were promulgated, they were reasonably calculated to meaningfully benefit Haley with respect to her academic needs.[13]

### 2.   *Haley's social needs*

Although the IEPs in question properly addressed Haley's academic needs, the court must also consider whether those plans properly addressed Haley's other, non-academic needs.  See Lenn, 998 F.2d at 1089 (An IEP "must target all of a child's special needs, whether they be academic, physical, emotional, or social." (emphasis in original; internal citation omitted)).  As noted, when compared to her contemporaries, Haley had below average social and communication skills, and demonstrated immaturity and emotionality.  Among other things, she needed assistance in learning how to deal with unfamiliar people and to refrain from

------------------------------------------------------------

[13]As a final aside, the court takes note of the plaintiff's passing reference to the fact that Haley received "no instruction in mathematics at all, even in a general education course, for two straight semesters" under the IEPs in question.  Pl.'s Decision Memo. (document no. 30) at 14 (emphasis omitted).  This is a red herring.  Block scheduling appears to have been the norm at Somersworth High School, and as just discussed, Haley's placement in a mainstreamed mathematics curriculum was not unreasonable (and, indeed, in accord with the IDEA's preference).  To the extent the plaintiff is suggesting that continuous, uninterrupted mathematics instruction was necessary for Haley to derive a meaningful benefit from her education, she has not cited any evidence in support of that proposition.

socially offensive behavior.  The plaintiff explains that the
"crux of [her] argument is that the IEPs at issue were
inappropriate because they did not include a single special
education or related service designed to address" them.  Pl.'s
Reply Memo. (document 31) at 6; see also id. ("[W]ith respect to
Haley's substantial social/emotional needs, the District's IEPs
provided her with no specialized instruction or therapies
designed to address her deficits in this critical area of
functional skills." (emphasis in original)).  This is simply
inaccurate.

In his order, the hearing officer noted that Haley's "social
and emotional issues were addressed at school."  Admin. R. at
2275.  In fact, those issues were more than just "addressed."
Contrary to the plaintiff's argument, the IEPs that she
challenges provided for at least one specialized service––her
daily assisted study hall––that targeted them.  See, e.g., id. at
700-14, 861-80.  Haley's case manager, a trained special
educator, attested that she used this period each day to work
directly with Haley on her social communication skills.  Id. at
146-47.  Among the things that she did to assist Haley in this
area were discussing or "scripting" Haley's day and what she
anticipated would occur, role playing, and "processing" Haley's

emotions and frustrations.[14]  Id.  Haley also received weekly
consultations from the District's speech-language pathologist, a
service that the District wrote into Haley's IEPs in response to
concerns over her social function the plaintiff raised.  See id.
at 148, 758, 871.

In addition to these specific IEP services, Haley received
additional instruction in social skills in the S-Cubed social
skills group, a regular curricular offering developed by two
"highly regarded specialists in the treatment of children with
social communication disorders."  Id. at 146, 162-63.  As
described in Parts II.B and C supra, that course was "based on an
inclusion model where students are paired with their peers to
help learn social cues and responding appropriately."  Id. at
146.  Among the premises underlying the course was that "for
children who need social skill development, it is best that they
learn from their peers," and "integration with non-disabled peers
is optimum."[15]  Id. at 163.  In the program, which met once per
week for 30 minutes, social "coaches" modeled socially

---

[14]Haley's case manager also testified that she used this
period, which occurred at the beginning of the school day, to
help Haley "process" her anxiousness before she began her
courses--a tactic that, the case manager opined, "had proven very
effective in the past."  Admin. R. at 157, 159.

[15]The District's school psychologist also opined that "access
to non-disabled peers . . . is particularly important in
enhancing [Haley's] social skill development."  Admin. R. at 179.

appropriate behavior, and the students engaged in role playing
and behavioral reversal.  Id. at 164-65.  Haley's case manager
testified that she was familiar with this course, and "actively
reinforce[d]" the skills taught when working with Haley.  Id. at
147.

The District's witnesses testified that, in their opinion,
these methods of instruction, and Haley's IEPs, were reasonably
calculated to benefit her.  See, e.g., id. at 148-60, 177-81,
197-203, 2123.  Indeed, the District's school psychologist
testified that the only appropriate way to teach social skills
was in a group--as in the S-Cubed program.  Id. at 2105.  The
Aucocisco School's director--again, the only professional
educator to testify on the plaintiff's behalf--did not offer any
opinion as to the appropriateness of the IEPs in this area.
Moreover, it appears that the District's IEPs incorporated all of
the recommendations that Dr. Doiron, Haley's neuropsychologist,
made.  Id. at 1653-63.[16]

In spite of this, Dr. Doiron opined that Haley's
"developmental level [was not] at a point where she could really
make full use of" the support services set forth in her IEP.  Id.

---

[16]The court must confess, though--and this may admittedly
reflect more poorly on the court itself than on the witness--that
Dr. Doiron's testimony regarding these recommendations seemed
quite vague.  See, e.g., Admin. R. at 1624-25, 1627.

at 1634; see also id. at 1668.  Dr. Doiron conceded, however,
that he was unfamiliar with the S-Cubed program, and that he had
not had the opportunity to observe either Somersworth High School
or Haley in that setting, id. at 1632-33, 1643-44, 1659, so the
court cannot accord substantial weight to his opinion in this
regard.  In any event, where--as here--"the evidence permits two
plausible views of adequacy/appropriateness, the agency's choice
between them cannot lightly be disturbed."  Roland M., 910 F.2d
at 994.

Again, too, the record shows that Haley's social skills
progressed under the District's regimen.  Haley's case worker
opined that Haley had "unequivocally benefitted" from her social
skills instruction, Admin. R. at 146, and gave a number of
examples of how Haley had made progress in adjusting her behavior
during her interactions with others, id. at 1818-19.  The
facilitator of the S-Cubed group described how, at the outset of
her high school career, Haley "was quite shy, withdrawn from her
peer group and nonassertive . . . often misread social cues and
. . . was quite anxious and fearful in speaking up in public and
in groups."  Id. at 165.  Over the two years the facilitator
observed her, Haley became "better able to understand and read
emotions, opened up more readily to the group and volunteered
information in group settings."  Id. at 166; see also id. at

54

2098-2103.  The District's school psychologist also noted that
Haley had become "much more relaxed" and less shy, id. at 174,
growth also confirmed by Haley's teachers in her substantive
courses, e.g., id. at 192, 2162.[17]

In what might be an effort to counter this evidence, the
plaintiff emphasizes Haley's poor performance on standardized
tests, which, among other things, revealed that, "when compared
to peers her age, Haley [was] functioning well below the average
range in social and communication skills, community skills, motor
skills, and personal living skills."  Pl.'s Decision Memo.
(document no. 30) at 11 (quoting Admin. R. at 807).  She comments
that "[t]he hearing officer apparently referenced none of these
facts in reaching the conclusion that Haley's IEPs were
appropriate in addressing her severe social and adaptive skill
deficits."  Id. at 12.  The plaintiff does not explain, however,
how this evidence could or should have affected the hearing
officer's decision, nor, more importantly, how it should affect
this court's decision.

_____

[17]The plaintiff's own perception of Haley's interactions with
others may have been markedly different.  The plaintiff did not,
however, have the same opportunity to observe Haley interacting
with her peers in the way her teachers did.  Haley's behavior at
home, where she was around people she knew and was comfortable
with, moreover, does not strike the court as a reliable indicator
of how well the District was preparing her to interact with
unknown or less familiar people.

In the absence of such an explanation, the court does not view these standardized test scores as undermining the hearing officer's conclusion that the IEPs provided appropriate social skills instruction.  As another district court has held, "[w]hen measuring a child's educational achievement, the child should not be compared to a nondisabled child."  H.C. v. Katonah-Lewisboro Union Free Sch. Dist., No. 09-cv-10563, 2012 WL 2708394, *14 (S.D.N.Y. May 24, 2012) (internal quotation marks and alterations omitted).  As that court observed, it makes little sense to try to "measure [a disabled student's] progress by comparing her test results to the mean average of the educational abilities of children her age" because "a child's academic progress must be viewed in light of the limitations imposed by the child's disability."  Id.  Indeed, Dr. Doiron opined that, due to the "severe brain trauma" Haley suffered in utero, "her problems are biological, they're fixed, they're continuing" and her limitations are "just sort of set there."  Admin. R. at 1623.  It is therefore unsurprising--and of no consequence to the adequacy of the IEPs--that certain of Haley's cognitive abilities are and have remained statistically lower than those of her non-disabled peers.  That is to be expected; the only question for this court is whether the IEPs were reasonably calculated to enable Haley to meaningfully improve her social skills despite this disability.

As just discussed, the evidence supports the conclusion that they were.  It is true that, as the plaintiff notes, there is some evidence that Haley made even more progress on her social skills while at Aucocisco (evidence that, the court must note, is inconclusive given that Haley's interactions there were primarily with disabled, rather than non-disabled, peers).[18]  But, "[i]n assessing the adequacy of an IEP, [the court does] not consider whether another program would have been 'better' but only whether the District's IEP was reasonably calculated to provide [the student] with some educational benefit."  Mr. G v. Timberlane Reg'l Sch. Dist., 2007 DNH 002, 29.  Id.  In light of the testimony related above, and Haley's meaningful social progress, the court concludes that the District did not fail to provide Haley a FAPE with respect to her social and emotional needs.

---

[18]The plaintiff also notes that Haley "experienced social difficulties with peers" at Somersworth, citing several e-mails in the record as evidence.  Pl.'s Decision Memo. (document no. 30) at 12; see also Pl.'s List of Disputed Facts (document no. 26) at 18-19, 24-25.  But the plaintiff has cited no evidence that the interactions related in these e-mails were attributable to Haley's disability, rather than more or less typical of the problems that high school students face--let alone that they indicate that she was not receiving an appropriate education. So, insofar as the plaintiff is suggesting that the IDEA obligated the District to take some action to ensure that Haley did not experience difficulties with her peers, the court cannot agree with that proposition.  "The law does not mandate services addressing problems truly distinct from learning problems." Samantha B. v. Hampstead Sch. Dist., 2009 DNH 196, 28 n.31 (quoting Mr. I., 480 F.3d at 12).

### 3.   *Emotional harm to Haley*

The court's determination that the IEPs addressed Haley's academic and social skills deficits as required by the IDEA does not conclude the analysis.  The plaintiff also argues that the IEPs were insufficient because they affirmatively caused "emotional harm" to Haley.  Pl.'s Decision Memo. (document no. 30) at 19-21.  She contends that "[u]nder the IDEA, an IEP . . . must be found to be inappropriate if [its] implementation is emotionally harmful to the child."  Id. at 19 (citing Colin K. v. Schmidt, 536 F. Supp. 1375, 1387 (D.R.I. 1982)).  The court does not agree with this interpretation of the law, or with the plaintiff's interpretation of the record.

If the implementation of an IEP causes harm to a child, that is undeniably a terrible result.  But, as discussed in Part III.B.1 supra, our Court of Appeals has emphasized that "actions of school systems cannot . . . be judged exclusively in hindsight."  Roland M., 910 F.2d at 992.  Instead, as already mentioned, the court must review the adequacy of an educational plan "at the time the IEP was promulgated."  Id.  A court therefore cannot view an IEP in retrospect and conclude solely on the basis of resultant "harm" to the student that the school district failed to fulfill its obligations under the IDEA. Rather, if harm to the student plays a role in evaluating an IEP,

that role must be limited to assessing whether the possibility of such harm should have been apparent to the school district at the time it promulgated the IEP.  Cf. Greenbush Sch. Comm. v. Mr. & Mrs. K, 949 F. Supp. 934, 942-43 (D. Me. 1996) (evaluating proposed IEP prospectively in light of harm that would likely result from its implementation, not retrospectively in light of harm that had resulted); Colin K., 536 F. Supp. at 1387 (same).[19]

With an eye to that inquiry, the court concludes that the plaintiff has not shown that the District, at the time it proposed the IEPs in question, should have apprehended that the plans could cause harm to Haley (or, for that matter, that they caused harm to Haley at all).  To be sure, Haley experienced some anxiety at school, which the District's witnesses openly acknowledged.  E.g., Admin. R. at 159, 173, 180.  They did not attribute that anxiety solely to school itself, however--indeed, Haley's case manager described how Haley experienced some anxiety due to the expectations the plaintiff had placed on her.  Id. at

---

[19]The court notes that one of the authorities upon which the plaintiff relies--Boston Public Schools, 40 Individuals with Disabilities Education Law Report 108 (Mass. St. Educ. Agency Dec. 10, 2003)--suggests that a school district may have an obligation to alter or reevaluate an IEP that is appropriate at its inception if the district becomes aware that the IEP's implementation is causing harm or distress to the student.  There is an intuitive appeal to this interpretation, but the plaintiff has not endeavored to explain how it squares with either the statutory text or governing case law, so the court cannot endorse it at this time.

59

1820-21.  According to the case manager, based upon her daily "charting" of Haley's emotions, "although like any student, Haley had her ups and downs, she [did] not hate school or dread being [there]."  Id. at 158.

While the plaintiff asserts that "issues in Haley's school program and placement were the principal determinants of her negative behaviors and compromised emotional state at home," Pl.'s Decision Memo. (document no. 30) at 20, she presented little evidence that Haley actually suffered any harm as a direct result of the IEPs' implementation.  One would have to read the sole evidence the plaintiff cites in her memorandum[20]--testimony by Dr. Doiron--extremely generously to come to the conclusion that Haley's difficulties at school were the "principal determinants" of her "compromised emotional state at home."  Dr. Doiron did testify that Haley experienced some "apprehension" about returning to Somersworth High School, but he identified the

---

[20]The plaintiff has cited no evidence in support of her conclusory assertions that "[i]ssues at school were the source of [Haley's] emotional discomfort throughout her experience at Somersworth High School" and that "Haley's public school placement caused her to become more and more alienated and at risk of depression as time went on."  Pl.'s Decision Memo. (document no. 30) at 21.  Similarly, although the plaintiff observes that Haley "complained regularly of headaches," id. at 12, she has identified no evidence establishing a causal connection between those headaches and Haley's programming or experiences at Somersworth High School.

source of Haley's anxiety as her "environment" generally, not her
educational plan.  Admin. R. at 1622.

The plaintiff has identified several instances in which
difficulties with or at school caused Haley to cry or become
teary-eyed, and other instances in which Haley reported stress
due to school.  See, e.g., id. at 455, 479, 964, 1153, 1735,
1739.  While the court is sympathetic to Haley and does not doubt
the difficulties she encountered at school, there is no evidence
in the record from which the court can conclude that these
occasional complaints were attributable to deficiencies in the
District's IEPs, let alone deficiencies that should have been
apparent before the fact.  Nor has the plaintiff pointed to any
evidence that the District failed to deal appropriately with
Haley's stress and tearfulness.  To the contrary, the record
indicates that the District took preëmptive measures in an
attempt to manage these difficulties.  Among other things,
Haley's case manager noted, the "scripting" that she provided in
Haley's academic skills class "visibly relieved the anxiousness
Haley was feeling."  Id. at 159.  The District's psychologist
confirmed that this scripting was beneficial in dealing with
Haley's anxiety, as were her case manager's daily "check ins."
Id. at 180-81.  And, as discussed in the previous section,

witnesses testified that Haley actually became less anxious and more relaxed over time.

The court therefore cannot conclude that implementation of the District's IEPs harmed Haley.

## C.    Reimbursement for private placement

"[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without consent of the state or local school officials, do so at their own financial risk.  If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents [will] be barred from obtaining reimbursement . . . ."  Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 373-74 (1985); see also Five Town, 513 F.3d at 289 (reaffirming this principle).  Because, as just discussed, Haley's tenth- and eleventh-grade IEPs were appropriate, the court cannot order reimbursement for Haley's unilateral placements at the Riverview and Aucocisco Schools.

## IV.  Conclusion

For the foregoing reasons, the court concludes that the plaintiff did not file an administrative due process complaint regarding alleged deficiencies in Haley's ninth-grade IEP and its amendment within the applicable limitations period, and is therefore barred from challenging those plans.  The court also

62

finds that Haley's tenth- and eleventh-grade IEPs offered her a FAPE in accordance with the IDEA.  The New Hampshire Department of Education's denial of reimbursement for the costs of Haley's unilateral placements at the Riverview and Aucocisco Schools is therefore AFFIRMED.  The clerk shall enter judgment accordingly and close the case.[21]

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 5, 2013

cc:  Richard L. O'Meara, Esq.
     Jeanne M. Kincaid, Esq.
     Melissa A. Hewey, Esq.

---

[21]The plaintiff's counsel appears before this court frequently.  As such, the court expects him to be familiar with and observe the local rules of this court.  Counsel is reminded that pursuant to Local Rules of Civil Procedure 7.1(a)(3) and 9.3, IDEA decision memoranda are limited to twenty-five pages.  The plaintiff's decision memorandum exceeds thirty pages, in clear contravention of these rules.  So far as the court can tell, the plaintiff's counsel has faithfully observed this court's page limitations in the past.  Counsel is cautioned, however, that he should continue to do so or risk difficulties with the court.  See L.R. 1.3(a).